**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

In re:

BYRON DAVID                                              Case No. 18-12396-KHK
    Debtor                                                  Chapter 11

## MEMORANDUM OPINION

This matter came before the Court on the Debtor, Byron David's, Omnibus Objections to Claims 3-3, 4-3, 5-3, 6-3 and 7-3 (Docket Nos. 65-69) filed by Summit Community Bank ("Summit").[1] Summit filed Responses to the Debtor's Objections at Docket Nos. 85, 86, 88, 89 and 90. The Court conducted an evidentiary hearing on the Objections on October 9, 2019. At the conclusion of the hearing, the Court took the matters under advisement.

**I.     Background**

Lisa and Byron David were married in 1991. Until 2012, Mr. David was part owner of Blue Ridge Technical Services, Inc. ("Blue Ridge") along with his partner Kenneth Woolfrey. Lisa David was an accountant by trade and served as the bookkeeper for her husband's company. She was also part owner of David-Cantrall and Associates, Inc. ("David-Cantrall") a real estate investment company, along with her partners, Wesley and John Cantrall and Michael Firetti.

From 2005 to 2012, Summit loaned over three million dollars to David-Cantrall and companies owned and controlled by its partners as evidenced by Summit's proofs of claims and supporting documents. The promissory notes for the loans bore the signatures of the partners and

---

[1] Claim 3-3 is for $1,217, 519.62 owed on loan # 359186. Claim 4-3 is for $288,582.76 owed on loan # 358003. Claim 5-3 is for $574,014.66 owed on loan # 358367. Claim 6-3 is for $295,580.81 owed on loan # 360540. Claim 7-3 is for $210,227.75 owed on loan # 362232. The total amount owed is $2,585,925.60 making Summit Bank the largest creditor in this case. All the claims are unsecured.

1

were secured by deeds of trusts on properties owned by the partners and their spouses and by their personal guarantees.

When the companies defaulted on the loans, Summit foreclosed on the properties under the deeds of trust, including the Davids' personal residence. After disposition of those assets, Summit sued Byron David for the deficiencies due on the notes.

This proceeding was commenced by Mr. David's voluntary Chapter 7 petition filed on July 10, 2018. On April 10, 2019, the Court granted the Debtor's Motion to Convert his Chapter 7 case to a Chapter 11 case. Summit's five claims for the deficiencies are based on the personal guarantees attached to its proofs of claims. The Debtor denies signing the guarantees and asks this Court to disallow all of Summit's claims in their entirety. For the reasons stated below, this Court overrules the Debtor's Objection to Claim 4-3 and sustains his Objections to Claims 3-3, 5-3, 6-3 and 7-3.

## II. Findings of Fact

Lisa David handled her family's household finances from 1991 to 2012. Transcript ("Tr.") 136:12-14. On August 29, 2012, Mr. David discovered irregularities within their household finances after receiving a phone call from USAA saying that a joint credit card had been overrun. Tr. 135:10-11. Later that afternoon, after Mr. David confronted his wife about this and other discrepancies, Lisa David committed suicide by shooting herself in the abdomen in her front yard. She died the same day as a result of her self-inflicted wounds. Tr. 138:16; Exhibit ("Ex.") B-Death Certificate of Lisa David.

Following Lisa's death, additional discrepancies in the Davids' personal and business financial affairs were uncovered. On August 30, 2012, Blue Ridge discovered it was unable to make payroll and that its checking account was empty. Tr. 139: 6-12. When the partners tried to establish an equity line of credit in order to make payroll, they discovered that the business had

2

already overrun a line of credit for $250,000 the partners did not know existed, and that the line of credit was secured by personal guarantees bearing the signatures of Mr. and Mrs. David and Mr. and Mrs. Woolfrey that Mr. David and the Woolfreys did not sign. Tr. 139:5-140:12.

Thereafter, Blue Ridge hired Cindy Vu, a forensic accountant, to investigate Blue Ridge's finances. Ms. Vu determined that Lisa David had embezzled more than three million dollars to pay Summit and other creditors. Tr. 141:16-142:6. *See also* Debtor's Motion for Summary Judgment (Docket No. 78), Fraud Examination Report (Ex. J), at 2. Ms. Vu concluded that Lisa David misappropriated $2,812,202.81 in company funds by, among other things, failing to file business tax returns, failing to pay employee 401(k) accounts, skimming from accounts receivables and forging the signatures of Byron David, Kenneth Woolfrey and Debra Woolfrey to incur a bank loan on behalf of Blue Ridge from the Bank of Clarke County in the amount of $500,000. *Id.* at 8.

Also in the days following Lisa's death, Ellen LoCascio, a retired Central Intelligence Agency engineer and friend of 23 years to the David family, discovered hundreds of other suspicious documents in Lisa David's home office. Some documents had been shredded and others had been altered by cutting and pasting or taping, including receipts and various loan documents. Included were altered documents related to Blue Ridge and altered Internal Revenue Service documents. Tr. 52-53; Ex. F – Original Documents found in Lisa David's home office.

Mr. David was not aware of the personal guarantees bearing his signature held by the bank until after Lisa died in 2012 when Summit's bank officers came to his home to discuss his financial obligations and the upcoming foreclosure of his residence. Tr. 143-145.

Prior to 2012, as a matter of policy, Summit scanned all loan documents. It stored the original promissory notes and deeds of trust and destroyed all other original documents related to the loans, including personal guarantees, after the scans were created in accordance with its then current document retention policy. Tr. 34:7. Sometime after Summit sued Mr. David to collect

3

on the personal guarantees, the bank changed its policy and now stores all original guarantees on its loans along with the original notes and deeds of trust. Tr. 33-34.

Mr. David denies having signed any of the guarantees supporting Claims 3-3 through 7-3. However, when he was sued by Summit in Loudoun Court Circuit Court before he filed for bankruptcy, he initially admitted he signed the guarantee supporting Claim 4-3 identified in this proceeding as Exhibit 4. *See* Ex. 169 - Response to Plaintiff Summit's Request for Admissions at 1. The Admissions were endorsed and submitted by Mr. David's counsel on October 18, 2013. *Id.* at 17. Then, on November 1, 2013, in response to Summit's Interrogatories in the state court proceeding, Mr. David again admitted he signed one loan guarantee; however, he claimed the guarantee was unenforceable because it violated statutes regarding the extension of credit to a spouse, and because it was replaced by a guarantee signed by someone else. Ex. 170 - Defendant Byron David's Answers to Plaintiff's First Interrogatories at 3. Blue Ridge also filed a separate civil action against Summit. In his Response to the Defendant's Interrogatories in that case, Mr. David denied signing the guarantees and stated that Lisa David forged his signature on the documents without his knowledge or authority. This Response was signed by Mr. David and acknowledged on October 24, 2013. Ex. 173- Plaintiff's Response to Defendant's First Interrogatories at 2-4.

Mr. David and Summit both hired certified forensic document examiners as experts to determine who put pen to paper on the guarantees. Mr. David hired John W. Hargett, III. *See* Ex. 161 – Expert Report from John Hargett. Summit hired Robert N. Morris. *See* Ex. 158 – Expert Report of Ronald Morris. The examiners attested they did not examine any of the acknowledgements that followed the last page of the guarantees and therefore they gave no weight

in their expert reports to the notary signatures or seals. Tr. 95-96; 99-101 and 199.[2]

Mr. Hargett examined 5 original Allonges and 32 other photocopied documents bearing Mr. David's signature. Of the 37 documents examined, Mr. Hargett concluded the following to a reasonable degree of certainty:

1. The Allonges, bearing pen and ink signatures, were not signed by Mr. David. Tr. 75:12-76:3. The Allonges are identified as Exhibits 20, 53, 85, 113 and 142.

2. Five of the remaining 32 signatures on the photocopies of documents appeared to be the signatures of Mr. David and are identified as Exhibits 4, 7, 34, 37, and 70. Tr. 76:8-1.

3. Even though five of the remaining signatures on the photocopied documents appeared to be Mr. David's, it was impossible to tell who actually put pen to paper on the original documents from which the photocopies were made because the originals had been destroyed by Summit and were not available for comparison. Ex. 161 at 1. *See also* Tr. 76-78; Tr. 85:8-15; Ex. 160 at 7.

4. The remaining 27 signatures that were examined did not appear to be penned by Mr. David. Tr. 76:11-14.

5. To a reasonable degree of probability, the features of the forged signatures of Byron David agree with Lisa David's signature in that they all loop to the left; the terminal stroke of the last loop tends to go down below the line of writing; and the beginning and ending strokes are tapered suggesting fast writing. Ex.161 at 3.

Mr. Morris examined the 5 original Allonges and 36 other questionable signatures of Mr. David and made the following conclusions:

1. The Allonges, bearing pen and ink signatures, were not signed by Mr. David. Tr. 225:1-20.

2. In all probability, Mr. David wrote the signatures appearing on five of the photocopied documents identified as Exhibits 4, 7, 34, 37, and 70. These documents are identified in Mr. Morris' Expert Report as Q25 through Q30 respectively.[3]

3. Mr. Morris could not conclude that Byron David signed the original documents represented by Exhibits 4, 7, 34, 37 and 70 because all of the handwriting characteristics, qualities and features that would have been found on the original documents were not recorded on the photocopies.

---

[2] Acknowledgments are always separate attachments that follow the last page of the guarantee instruments. Tr. 236, 245-246, 249, 256-258.

[3] Mr. Morris noted that the signatures identified as Q29 and Q30 are identical.

5

4. He could not determine whether Mr. David wrote any of the remaining questioned signatures in his name.

5. He could not determine whether Lisa David signed Byron David's name on originals of the remaining photocopied documents examined because he did not have the proper samples to make comparisons. Ex. 158 at 6.

The signatures on the Allonges and guarantees were notarized. Victoria (DeMeza) Melby, one of the notaries, testified that Exhibits 20, 53, 85, 113 & 142 looked like original documents with her signature and seal. Tr. 105-113. She testified she usually had everyone before her and checked their identification cards before they signed the documents she notarized. Tr. 105. She did not recall Mr. David putting pen to paper in front of her to endorse the aforementioned documents. Tr. 114-115.

Kerry Self, owner of Leesburg Title and Escrow and a notary, testified she sometimes notarized 50 to 100 documents per day. Tr. 120. She identified her signature and seal on Exhibits 7 and 37. Tr. 124:1-21; 125:16-20. She did not recall notarizing any of the documents for Mr. David. Tr. 122-123. She testified she never notarized a document without having the person in front of her. Tr. 123: 4-7. However, although she routinely made photocopies of identification cards of the individuals who signed before her, she admitted she did not do so for documents involving David-Cantrell because of her long-standing business relationship with Lisa David. Tr. 129-130.

In his testimony, Mr. David denied signing any of the guarantees before notaries. He specifically denied appearing before Kerry Self except to sign other documents at a closing on real estate that he and Lisa David purchased with a loan from Middleburg Bank. Tr. 145-146. He specifically denied ever appearing before Victoria Melby except to sign guardianship documents for his children after Lisa's death. Tr. 147-148.

Mr. David also denied ever appearing before Jeanne Estes, a friend of Lisa's whose notary

6

seal and signature appear on Exhibit 70. Tr. 155.

### III. Conclusions of Law

A claim for which a proof of claim has been filed is allowed unless an objection is filed. If an objection is filed, the Court is required to determine the amount and validity of the claim as of the date of the filing of the petition. A properly filed claim is prima facie evidence of the amount and validity of the claim. Therefore, the objecting party has the initial burden of presenting sufficient evidence to overcome the prima facie effect of the filed proof of claim. Once the objecting party has done so, the burden of proof shifts to the creditor to establish the amount and validity of its claim. *See* Official Comm. of Unsecured Creditors v. Fairchild Dornier GmbH (In re Dornier Aviation (N. Am.) Inc.), Adversary No. 02–8199–SSM, 2005 WL 4781236, at *11 (Bankr. E.D.Va. Feb.8, 2005) (*citing* 11 U.S.C. § 502(a)-(b); Fed. R. Bankr.P. 3001(f*);* C–4 Media Cable S., L.P. v. Reds T.V. & Cable, Inc. (In re C–4 Media Cable S., L.P.), 150 B.R. 374, 377 (Bankr.E.D.Va.1992)); Fed. R. Bankr. P. 9017; Fed. R. Evid. 301; 4 Collier at P 501.02[3][d]).

Mr. David contends that Summit's claims are not valid and must be disallowed because the guarantees supporting them are forgeries and because of the doctrine of spoliation. He also contends that Summit's claims should be barred under the equitable doctrine of unconscionability and because Summit violated the Equal Credit Opportunity Act by requiring him to sign the guarantees. The Court will examine each theory in turn.

A. Forgery

But for admitting he signed Exhibit 4 in this proceeding, Mr. David steadfastly denied being involved in Lisa David's business before her death. His testimony was consistent and credible on this point and this Court is persuaded that Summit failed to produce sufficient evidence to refute his testimony.

7

Ms. LoCascio gave compelling testimony supporting Mr. David's assertion that Lisa David was capable of and had in fact fabricated financial statements. She identified Exhibit F as a small fraction of the documents she found in Lisa's home office after she died. Tr. 52: 7-9; 56:15-17. Moreover, Cindy Vu's Fraud Examination Report confirms that Lisa David had forged several documents in order to secure loans for Blue Ridge in the past.

Although Summit produced evidence through witness testimony that Mr. David signed four of the guarantees before notaries, neither notary who gave evidence could attest that she remembered Mr. David signing the original guarantees. Ms. Melby gave tentative responses. For example, when asked to describe her procedure for notarizing documents, she responded, "[*U*]*sually* (emphasis added) everybody that's signing is there, and I take I.D., and then we notarize it." Tr.105:19-20. Even under direct examination, when handed the original Allonges represented by Exhibits 20 and 53, she did not recognize the first pages of either document. Tr. 106-107; 110. When asked to identify her signature on the original acknowledgment of Exhibit 20 she replied, "It looks like my signature, and it's my notary number, but …" and "It looks like it…" and "I mean, it *looks* (emphasis added) like an original." Tr. 106:13; 107:21. She seemed reluctant to commit to her answers leaving the Court to question her credibility.

Ms. Melby was also the notary who acknowledged Mr. David's signature on the Allonges. As previously stated, both experts concluded that the pen and ink signatures appended to the Allonges were not genuine signatures of Byron David. Tr. 75:17-25; 225:1-20. In light of their opinions, this Court gives no weight to Ms. Melby's acknowledgments and declines to conclude that any of the signatures on the photocopied documents she acknowledged are genuine.

Ms. Self was more self-assured when she testified; however, she freely admitted that she routinely bent her own rules when notarizing documents for Lisa David because of their long-standing relationship. Tr. 130: 16-22. Furthermore, two of the acknowledgements indicate

8

differences in Ms. Self's notary seals. The printed name on her seal on Exhibit 7 appears to be straight and the middle initial of her name is followed by a period. However, on Exhibit 37, the middle initial of the printed name on her seal is not followed by a period and the middle initial itself is not aligned with her first and last names. These exhibits clearly support Mr. David's assertion that the documents are fabrications.

The opinions of the handwriting experts for the parties were very similar. As previously stated, they agreed that Mr. David did not put pen to paper on any of the Allonges produced by Summit. Next, they agreed that only five of the signatures on the various guarantees to the notes and extensions of the notes were probably penned by Mr. David. However, both experts acknowledged that it was not possible to establish whether the five photocopied guarantees appearing to have his signature were genuine or the products of fabrication because these documents could not be compared to the original instruments with penned signatures that were destroyed by Summit. Indeed, Summit's own expert has opined that computer software such as Photoshop can be used to digitally apply the signature of an unsuspecting victim from some other document onto an entirely different document, and that the technology to do so was available when the documents relevant to this case were signed.[4]

Mr. David's specific denials of signing the guarantees attached to Claims 3-3, 5-3, 6-3 and 7-3 and other evidence before the Court tends to show that some of the documents that serve as the bases for these claims are fabrications that may be forgeries created by Lisa David. For

---

[4] *See* Ex. C – Article by Ronald N. Morris entitled "*Is it Fabricated*" wherein he states, "courts must take the position of "[n]o original, no case!" (internal quotation marks omitted). *See also* Ex. D - Excerpt from THE FORENSIC LABORATORY HANDBOOK: PROCEDURES AND PRACTICE (acknowledging the field of forensic document examination has universally recognized that the availability of original documents is critical and necessary to a meaningful document analysis); and Ex. E – Excerpt from FORENSIC SCIENCE: AN INTRODUCTION TO SCIENTIFIC AND INVESTIGATIVE TECHNIQUES (addressing issues that arise when analyzing photocopied documents).
.

example, Claim 6-3 is based on a promissory note dated January 5, 2006 that states the borrowers agree to pay interest for only one month - from January 6, 2006 to February 6, 2006 - even though the term of the note appears to be one year.  Moreover, the date on the acknowledgment of the guarantee for the note is January of 2005, one full year *before* the borrowers signed the note.  For these reasons, the Court finds Mr. David has met his burden of rebutting the presumptive validity of Claims 3-3, 5-3, 6-3 and 7-3, and that Summit must bear the ultimate burden of proving that Mr. David signed the instruments it seeks to enforce by a preponderance of the evidence. *Id.*

 B. Spoliation

Spoliation refers to "the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) (*citing* West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

A party has a duty to preserve evidence that may be relevant to anticipated litigation.  In determining whether and at what point the duty arose, the Court must consider the totality of the circumstances, including the extent to which the party was on notice that specific and identifiable litigation was likely and that the evidence would be relevant.  VA Code Ann. §8.01-379.2:1.

Mr. David contends that Summit's claims should be disallowed because the lender is responsible for destroying the original documents which, according to the experts, are necessary to prove Mr. David did not put pen to paper on the originals.  However, Summit had no duty to preserve the guarantees in perpetuity. While it is undisputed that Summit seeks to enforce original documents it destroyed, the duty to preserve arises when a party "reasonably should know that the evidence may be relevant to anticipated litigation." Silvestri, 271 F.3d at 591 (*citing* Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)). In the instant case, Summit destroyed the documents long before thoughts of litigation against Byron David arose. Its long-standing blanket

policy of destroying guarantees was not in effect for the sole purpose of spoliating evidence for litigation.  *See* Summit v. David-Cantrall and Associates, et. al., Case No. CL80949-00 (Cir. Ct. Loudoun Oct. 19, 2015), Depo. Tr. of Patrick Frye, Corporate Designee of Summit Community Bank at 23:19-23, 24:1-5, 26:4-16 and 27:8-15. That Summit reversed its document retention policy to that of retaining original guarantees is not relevant here as no evidence was presented to show Summit was aware of the pending litigation with Mr. David when the guarantees were destroyed. Summit testified "less than half of 1% of all loans proceed to litigation." *See* Tr. 34:7; 182:23.

Moreover, "spoliation is not a substantive claim or defense but a 'rule of evidence,' and thus is 'administered at the discretion of the trial court.'" *Id.* at 450 (*quoting* Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155 (4th Cir.1995)).  However, the Court's inherent authority may only be exercised to sanction "bad-faith conduct," and "must be exercised with restraint and discretion," Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991).

Although the evidence at issue is central to the claims and defenses, Mr. David failed to meet his burden as to the first and second elements of spoliation. The Court finds that Summit's duty to preserve the guarantees did not arise at the time of the signing of the guarantees or their destruction as the bank was not on notice that specific and identifiable litigation was likely even though the evidence would be relevant.  Therefore, the Court cannot disallow the claims based on spoliation of the original guarantees.

C. Unconscionability

The Debtor argues that the "guarantee" instruments Summit seeks to enforce are really "suretyships." Under Virginia law, the primary distinction between a guarantee and a suretyship is that, in a guarantee, "the guarantor contracts to pay, if by the use of due diligence, the debt cannot be made out of the principal debtor." Piedmont G. & M. Co. v. Morris, 86 Va. 941, 944-45

11

(1890). In contrast, a "surety undertakes directly for the payment, and so is responsible at once if the principal debtor makes default." *Id*. Virginia case law provides if the instrument creates a suretyship, then the guarantor might have additional defenses against the lender's collection actions.[5] However, the Loudoun County Circuit Court found that the law of suretyship did not apply in this case. *See* Obj. to Debtor's Motion for Summary Judgment (Docket No. 87), Ex. E. This Court agrees with the Circuit Court, especially since Mr. David would not benefit under the facts of this case by arguing that the guarantee he signed created a suretyship. A guarantee requires the lender to proceed against the borrower and then against the guarantor, and that is what Summit did in this case. *See* Phoenix Insurance Co. v. Lester Brothers, Inc., 203 Va. 02, 807 (1962). When Summit was unable to seek recourse against Lisa David, it first pursued the corporate borrowers of the loans. Only after foreclosing on the properties of the corporate owners did Summit seek redress against Mr. David personally.

In the alternative, Mr. David pleads that the guarantees are facially unconscionable and unenforceable because they are of an indefinite duration and do not provide a means for the signer to terminate or revoke them. A party claiming that a contract is unenforceable because it is unconscionable bears the burden of proving unconscionability by clear and convincing evidence. Rogers v. Yourshaw, 18 Va. App. 816, 822 (1994). Absent evidence of gross disparity in value exchanged there exists no basis to claim unconscionability. Drewry v. Drewry, 8 Va. App. 460 (1989). Further, to determine the contract unconscionable, the Court must find that there is inequality so gross as to shock the conscience. *Id.*

Mr. David fails to meet his burden of proving that there was gross inequality in the value exchanged. While certain signatures are inauthentic, no evidence before this Court proves these

---

[5] *See* Board of Supervisors of Fairfax County v. Southern Cross Coal Corp., 238 Va. 91, 94, 380 S.E.2d 636 (1989) (An accommodation surety is entitled to the "strictissimi juris" rule which states that the surety is discharged by any change in the obligation underlying a bond no matter how slight.)

standard guarantee documents shock the conscience. Upon close examination of the disputed guarantees and their corresponding loans, the value exchanged regarding Claims 3-3 through 7-3 and the terms at issue do not express a gross inequality. For instance, loan number 362232 (Ex. 126) issued April 28, 2006 at a 0.5% interest rate for a loan amount of $199,750 fails to shock the conscience. Because Mr. David has failed to prove any of the loans shock the conscience, he cannot prevail on the theory of unconscionability.

D. Equal Credit Opportunity Act (ECOA)

"The purpose of the ECOA is to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refuse to consider for individual credit." Anderson v. United Finance Co., 666 F.2d 1274, 1277 (9th Cir. 1982). "It is generally held that the burden is on the spouse asserting a defense under the ECOA to prove that the applicant was otherwise creditworthy." Roper Bros. Lumber Co. v. Westover Homes, Inc., 44 Va. Cir. 448, 450 (Cir. Ct. of Spotsylvania County 1998) (emphasis added). The ECOA makes it unlawful for any "creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of . . . marital status." 15 U.S.C.S. §1691(a)(1) (2006). Regulation B of the ECOA further states, "… a creditor shall not require the signature of an applicant spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. 202.7(d)(1) (2013). To state a claim under 12 C.F. R § 202.7(d)(1), the Debtor must show (1) Summit determined that Lisa David was creditworthy in her own right; and (2) Summit nonetheless required Byron David to sign a "credit instrument." *Id*. § 202.7(d) (1). *See also* In re Woodford, 600 B.R. 520, 523 (2019).

The Debtor alleges that Summit violated ECOA regulations by requiring Lisa David, the applicant, to provide it with the guarantees of Mr. David because it did not conduct an independent

13

creditworthiness analysis of Lisa David. Instead, it required his guarantees solely because he was the spouse of a female principal borrower.

However, Summit reasonably concluded that Mr. David's guarantee was required. Mr. David presented no evidence to show Summit ever assessed the individual creditworthiness of Mrs. David and found her worthy. Summit admitted it assessed the creditworthiness of the borrowing businesses and their owners. Tr. 43-45. However, Mr. David was not a de facto joint applicant merely because he was Lisa David's spouse as other factors were also considered in the companies' credit applications. Summit considered the extent of the co-mingled assets, evaluation of the collateral, the "cash flow . . . [of the] operating company", and the underlying ownership before making the loans. The Bank required the signature of Mr. David because his wife, who held most of her assets jointly with her husband, chose to submit a joint financial statement with her spouse for review by Summit in its assessment of the creditworthiness of the operating companies. Tr. 39:22-25; 40:1-19; 43:3-25; 44:1-9. In other words, Lisa David made the decision to make Mr. David a co-applicant by submitting a joint financial statement instead of a statement in her name alone. Therefore, Summit's actions were "sound commercial practice unrelated to any stereotypical view of a wife's role." Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC, 476 F.3d 436, 442 (7th Cir. 2007). For this reason, Mr. David's challenge to Summit's claims based on ECOA violations fails.

**IV.    Conclusion**

In consideration of the evidence and arguments presented, the Court finds that Claim 4-3 is a valid claim against Mr. David's estate. Although it carries no acknowledgement, Mr. David admitted or confirmed on at least three occasions that he executed Exhibit 4, which is his guarantee for loan number 358003 supporting Claim 4-3. He therefore cannot claim that this guarantee is a

14

forgery.

The Court reaches a different result, however, with respect to Claims 3-3, 5-3, 6-3 and 7-3. Once the burden of proof of validity shifted to the bank, Summit failed to produce evidence sufficient to prove the photocopied guarantees supporting these claims were genuine copies of original documents signed by Byron David. This Court is not persuaded it should rely on a determination that "in all probability" Mr. David penned any of the four signatures that appear on the photocopied guarantees supporting these claims. Nor will the Court assume that any of the photocopied guarantees are genuine copies of original documents signed by Mr. David merely because each signature appears to be acknowledged by a notary. It cannot do so when the acknowledgements were not examined by the forensic experts and some show clear signs of fabrication.

The Court is persuaded that Claims 3-3, 5-3, 6-3 and 7-3 are based on fabricated photocopied documents, and that Lisa David had a history of committing forgery and fraud and had the opportunity, means and motivation to forge Byron David's signature on the guarantees supporting these claims. The weight of the evidence leads the Court to conclude that the documents supporting these claims are not genuine. Accordingly, the Court finds that Summit has failed to show by a preponderance of the evidence that the claims are valid and therefore, Claims 3-3, 5-3, 6-3 and 7-3 will be disallowed in their entirety.

The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.

Date: Jan 27 2020

/s/ Klinette H. Kindred

Klinette H. Kindred
United States Bankruptcy Judge

**Electronic copies to:**

James P. Campbell
Mark B. Callahan
Donald F. King
Jack Frankel

Entered on Docket: January 27, 2020