## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:

Byron F David                                         Case No. 18-12396-KHK

Debtor.                                               (Chapter 13)

### Memorandum Opinion

This matter is before the Court pursuant to the U.S. District Court's Memorandum Opinion and Order (Docket No. 366) reversing this Court's judgment with respect to Byron F. David's (the "Debtor")[1] objections to Summit Community Bank's Claims 3-3, 5-3, 6-3 and 7-3 (Docket Nos. 65, 67, 68 and 69) and remanding to this Court for further proceedings. In particular, this Court must determine under *Murdock v. Nelms*, 212 Va. 639, 641 (1972) whether the Debtor produced evidence showing "fraud or nonappearance" sufficient to rebut the presumption that the notarized documents were properly notarized and therefore valid. Additionally, because this Court's judgment relied in part on the Cindy Vu Fraud Examination Report, which was not admitted into evidence, this Court must review the Debtor's claim objection absent consideration of that Report. For the reasons that follow, the Court will overrule the Debtor's objections to 3-3, 5-3, 6-3 and 7-3 (Docket Nos. 65, 67, 68 and 69).

### Findings of Fact

This decision assumes familiarity with the underlying procedural background facts as recited in the U.S. District Court's Memorandum Opinion and Order (Docket No. 366). The Court makes the following findings of fact with respect to the remanded matters. Matters beyond the scope of the remand will not be addressed in this Opinion.

---

[1] Terms used but not defined herein have the terms ascribed to them in the U.S. District Court's Memorandum Opinion and Order (Docket No. 366).

Lisa and Byron David were married in 1991. Until 2012, Mr. David was part owner of Blue Ridge Technical Services, Inc. ("Blue Ridge") along with his partner Kenneth Woolfrey. Lisa David was an accountant by trade and served as the bookkeeper for her husband's company. She was also part owner of David-Cantrall and Associates, Inc. ("David-Cantrall") a real estate investment company, along with her partners, Wesley and John Cantrall, and Michael Firetti.

From 2005 to 2012, Summit loaned over three million dollars to David-Cantrall and companies owned and controlled by its partners as evidenced by Summit's proofs of claims and supporting documents. The promissory notes for the loans bore the signatures of the partners and were secured by deeds of trusts on properties owned by the partners and their spouses and by their personal guarantees.

When the companies defaulted on the loans, Summit foreclosed on the properties under the deeds of trust, including the Davids' personal residence. After disposition of those assets, Summit sued Byron David for the deficiencies due on the notes.

Lisa David handled her family's household finances from 1991 to 2012. Transcript ("Tr.") 136:12-14. On August 29, 2012, Mr. David discovered irregularities within their household finances after receiving a phone call from USAA saying that a joint credit card had been overrun. Tr. 135:10-11. Later that afternoon, after Mr. David confronted his wife about this and other discrepancies, Lisa David committed suicide by shooting herself in the abdomen in her front yard. She died the same day as a result of her self-inflicted wounds. Tr. 138:16; Exhibit ("Ex.") B - Death Certificate of Lisa David.

Following Lisa's death, on August 30, 2012, Blue Ridge discovered it was unable to make payroll and that its checking account was empty. Tr. 139: 6-12. When the partners tried to establish an equity line of credit in order to make payroll, they discovered that the business had already overrun a line of credit for $250,000 that the partners did not know existed. The line of credit was secured by personal guarantees bearing the signatures of Mr. and Mrs. David as well as Kenneth Woolfrey and Debray Woolfrey.

Thereafter, Blue Ridge initiated an investigation into the various guarantees underlying the guarantees bearing the signatures of Mr. David. Additionally, Ellen LoCascio, a retired Central Intelligence Agency engineer and friend of 23 years to the David family, discovered documents she viewed as suspicious in Lisa David's home. Apparently Ms. LoCascio discovered numerous documents that appeared to have been shredded, with some appearing to have been altered by cutting, pasting and taping. None of these documents related to the loans at issue in this matter. Tr. 52-53; Ex. F – Original Documents found in Lisa David's home office. Mr. David testified that he was not aware of the personal guarantees bearing his signature held by the bank until after Lisa died and Summit's bank officers came to his home to discuss his financial obligations and the upcoming foreclosure of his residence. Tr. 143-145.

Prior to 2012, as a matter of policy, Summit scanned all loan documents. It stored the original promissory notes and deeds of trust and destroyed all other original documents related to the loans, including personal guarantees, after the scans were created in accordance with its then current document retention policy. Tr. 34:7. Sometime after Summit sued Mr. David to collect on the personal guarantees, the bank changed its policy and now stores all original guarantees on its loans along with the original notes and deeds of trust. Tr. 33-34.

Mr. David denies having signed any of the guarantees supporting Claims 3-3 through 7-3. However, when he was sued by Summit in Loudoun Court Circuit Court before he filed for bankruptcy, he initially admitted he signed the guarantee supporting Claim 4-3 identified in this proceeding as Exhibit 4. See Ex. 169 - Response to Plaintiff Summit's Request for Admissions at 1. The Admissions were endorsed and submitted by Mr. David's counsel on October 18, 2013. Id. at 17. Then, on November 1, 2013, in response to Summit's Interrogatories in the state court proceeding, Mr. David again admitted he signed one loan guarantee; however, he claimed the guarantee was unenforceable because it violated statutes regarding the extension of credit to a spouse, and because it was replaced by a guarantee signed by someone else. Ex. 170 – Defendant Byron David's Answers to Plaintiff's First Interrogatories at 3. Blue Ridge also filed a separate civil action against Summit. In his Response to the Defendant's Interrogatories in that case, Mr.

David denied signing the guarantees and stated that Lisa David forged his signature on the documents without his knowledge or authority. This Response was signed by Mr. David and acknowledged on October 24, 2013. Ex. 173- Plaintiff's Response to Defendant's First Interrogatories at 2-4.

In light of Mr. David's challenge to the authenticity of his signatures on the relevant guarantees, Mr. David and Summit both hired certified forensic document examiners as experts to analyze the guarantees. Mr. David hired John W. Hargett, III. See Ex. 161 – Expert Report from John Hargett. Summit hired Robert N. Morris. See Ex. 158 – Expert Report of Ronald Morris. The examiners attested they did not examine any of the acknowledgements that followed the last page of the guarantees and therefore they gave no weight in their expert reports to the notary signatures or seals. Tr. 95-96; 99-101 and 199.

Mr. Hargett examined 5 original Allonges and 32 other photocopied documents bearing Mr. David's signature. Mr. Hargett examined the documents using a nine-degree scale of certainty for use during the analysis. Tr. 94. The scale included the following levels of confidence:

1. Identification- definitely the writer
2. Strong probability it's the writer
3. Probably the writer
4. Evidence suggests it could be the writer
5. No Conclusion
6. Evidence suggests it could not be the writer
7. Probably not the writer
8. Strong probability it's not the writer
9. Definitely not the writer

Of the 37 documents examined, Mr. Hargett concluded that:

1. The Allonges, bearing pen and ink signatures, appeared to have not been signed by Mr. David. Tr. 75:12-76:3. The Allonges are identified as Exhibits 20, 53, 85, 113 and 142. At times throughout his testimony Mr. Hargett and Debtor's counsel used the phrase "to a reasonable degree of certainty" to express the confidence level of Mr. Hargett's conclusion with respect to these allonges. Mr. Hargett later clarified and indicated that with respect to all five Allonges that the signature "appeared not to be [Mr. David's] signature." Tr. 76:1-3. Mr. Hargett testified that when he uses the word "appears" he means either probable (which is a 3 on the positive end of the confidence scale, or a 7 on the negative scale) or that there is evidence to suggest it could or could not be the writer (a 4 on the positive scale and a 6 on the negative scale). Tr. 93:5-12.

4

2. Five of the remaining 32 signatures on the photocopies of documents appeared to be the signatures of Mr. David and are identified as Exhibits 4, 7, 34, 37, and 70. Tr. 76:8-1.

3. Even though five of the remaining signatures on the photocopied documents appeared to be Mr. David's, it was impossible to tell who actually put pen to paper on the original documents from which the photocopies were made because the originals had been destroyed by Summit and were not available for comparison. Ex. 161 at 1. See also Tr. 76-78; Tr. 85:8-15; Ex. 160 at 7.

4. The remaining 27 signatures that were examined did not appear to be penned by Mr. David. Tr. 76:11-14.

5. To a reasonable degree of probability, the features of the forged signatures of Byron David agree with Lisa David's signature in that they all loop to the left; the terminal stroke of the last loop tends to go down below the line of writing; and the beginning and ending strokes are tapered suggesting fast writing. Ex. 161 at 3.

Mr. Morris examined the 5 original Allonges and 36 other purported signatures of Mr. David and made the following conclusions:

1. It could not be determined whether the Allonges, bearing pen and ink signatures, were signed by Mr. David. Tr. 225:1-20.
2. In all probability, Mr. David wrote the signatures appearing on five of the photocopied documents identified as Exhibits 4, 7, 34, 37, and 70. These documents are identified in Mr. Morris' Expert Report as Q25 through Q30 respectively.[2]
3. Mr. Morris could not conclude that Byron David signed the original documents represented by Exhibits 4, 7, 34, 37 and 70 because all of the handwriting characteristics, qualities and features that would have been found on the original documents were not recorded on the photocopies.
4. He could not determine whether Mr. David wrote any of the remaining questioned signatures in his name.
5. He could not determine whether Lisa David signed Byron David's name on originals of the remaining photocopied documents examined because he did not have the proper samples to make comparisons. Ex. 158 at 6.

The signatures on the Allonges and guarantees were notarized. Victoria (DeMeza) Melby, one of the notaries, testified that Exhibits 20, 53, 85, 113 & 142 looked like original documents with her signature and seal. Tr. 105-113. She testified she usually had everyone before her and checked their identification cards before they signed the documents she notarized. Tr. 105. She did not recall Mr. David putting pen to paper in front of her to endorse the aforementioned documents. Tr. 114-115. Ms. Melby also testified that the person signing had to appear physically in front of her. Tr. 105:21-23.

---

[2] Mr. Morris noted that the signatures identified as Q29 and Q30 are identical.

Kerry Self, owner of Leesburg Title and Escrow and a notary, testified she sometimes notarized 50 to 100 documents per day. Tr. 120. She identified her signature and seal on Exhibits 7 and 37. Tr. 124:1-21; 125:16-20. She did not recall notarizing any of the documents for Mr. David. Tr. 122-123. She testified she never notarized a document without having the person in front of her. Tr. 123: 4-7. However, although she routinely made photocopies of identification cards of the individuals who signed before her, she admitted she did not do so for documents involving David-Cantrell because of her long-standing business relationship with Lisa David. Tr. 129-130.

In his testimony, Mr. David denied signing any of the guarantees before notaries. He specifically denied appearing before Kerry Self except to sign other documents at a closing on real estate that he and Lisa David purchased with a loan from Middleburg Bank. Tr. 145-146. He specifically denied ever appearing before Victoria Melby except to sign guardianship documents for his children after Lisa's death. Tr. 147-148. Beyond these denials, Mr. David did not provide further evidence of nonappearance.

Mr. David also denied ever appearing before Jeanne Estes, a friend of Lisa's whose notary seal and signature appear on Exhibit 70. Tr. 155.

## Conclusions of Law

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate). Venue is appropriate in this Court under 28 U.S.C. § 1409(a).

The Bankruptcy Code imposes a "burden shifting framework for proving the amount and validity of a claim." *In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004). Federal Rule of Bankruptcy Procedure 3001(f) provides that "[a] proof of claim executed and filed in accordance with" the Federal Bankruptcy Procedure Rules "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); *see also Harford*, 372 F.3d at 640 (finding that when a creditor files a proof of

claim, that "constitutes prima facie evidence of the amount and validity of the claim"). Once the creditor has filed the proof of claim, "[t]he burden then shifts to the debtor to object to the claim." *Harford*, 372 F.3d at 640 (internal citations omitted). If the debtor meets this burden, the burden then shifts back to the creditor, who must prove by a preponderance of the evidence the amount and validity of the claim. *Summit Cmty. Bank v. David*, 629 B.R. 804, 810 (E.D. Va. 2021), *reh'g denied*, No. 120CV00137RDAJFA, 2022 WL 303242 (E.D. Va. Feb. 1, 2022) (citing *Harford*, 372 F.3d at 640). Because the Debtor at core claims that the loan documents supporting claims 3-3, 5-3, 6-3 and 7-3 are forgeries, notwithstanding the fact that the documents are notarized, the Court will start where it must: at whether the Debtor has met his burden to prove nonappearance or fraud under *Murdock v. Nelms*.

> As stated in *Murdock*,
>
> [i]t is settled in Virginia that taking and certifying of acknowledgments is a judicial act. Where it is admitted or established that there was an appearance before the certifying officer, his determination of the matters involved has the conclusive force and effect of a judgment and imparts absolute verity, and cannot be collaterally attacked. It cannot be impeached, even directly, save in a court of equity, and not then except for fraud.

*Murdock v. Nelms*, 212 Va. 639, 641 (1972) (citing *New v. H. E. Harman Coal Corp.*, 181 Va. 627, 634 (1943); *McCauley v. Grim*, 115 Va. 610, 612 (1913)). As further stated by the U.S. District Court in its Memorandum Opinion,

> In *Murdock v. Nelms*, the Virginia Supreme Court recognized that a notary acknowledgement could be impeached "by showing that the person who is alleged to have executed the instrument in question never appeared before the certifying officer and never actually acknowledged the instrument." 212 Va. at 642 (citations omitted). Thus, the Virginia Supreme Court ultimately indicated that a notary acknowledgment could be impeached under certain circumstances for "fraud or nonappearance[.]" Id. And under both forms of attack, the burden of proving the fraud or nonappearance rests on the party that alleges the deficiency. Id. The Murdock court also explained that notaries are "presumed to [ ] properly perform[ ] [ ] [their] duties[.]" (citations omitted).

(Docket No. 366, pg. 9). The nonappearance or fraud "must be proved by clear and satisfactory evidence – evidence that is positive, cogent and convincing." *New v. H. E. Harman Coal Corp.*, 181 Va. at 634. Clear and convincing evidence is "such proof as will establish in the trier of fact a firm belief or conviction

7

concerning the allegations that must be established." *Thompson v. Bacon* citing *Walker Agency, Inc. v. Lucas*, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975).

Turning to the Debtor's evidence, the Court cannot find that he has proven by clear and convincing evidence that a nonappearance or fraud has occurred. Debtor's only evidence presented in support of nonappearance is his testimonial denials that he appeared before the notaries in question. The handwriting expert's testimony and reports do not speak to whether or not the Debtor appeared before those notaries, but will be addressed further below. Ms. LoCasio, who testified regarding what she saw as evidence of fabricated documents found in the David home and Ms. David's alleged ability and propensity to falsify financial documents, did not identify any documents that related to the loans and guarantees at issue in this matter. Conversely, Ms. Melby and Ms. Self testified that their usual procedures when notarizing documents were to require the person signing to be present.[3] Viewing the evidence surrounding the notaries as a whole, the Court finds that the Debtor has failed to produce clear and convincing evidence sufficient to rebut the presumption that the notarized documents are valid and that the notaries performed their duties properly. If mere denials were sufficient to rebut the presumption afforded to notaries and the documents they notarize, the presumption would be worthless. *See Summit Cmty. Bank v. David*, No. 120CV00137RDAJFA, 2022 WL 303242, at *5 (E.D. Va. Feb. 1, 2022) (noting that appellee had provided no basis for the proposition that a notarized seal loses its legal luster as soon as a party cries foul).

The only other relevant additional admissible evidence before the Court consists of the testimony and expert reports of Mr. Hargett and Mr. Morris. The Court notes at the outset that the handwriting experts do not directly speak to whether Mr. David appeared before the notary. Indeed, the handwriting experts testified with respect to the Debtor's purported signatures and the documents themselves—issues that the

---

[3] While the Court initially found Ms. Melby's answers to be somewhat tentative, upon review, the Court finds that the tentative nature of Ms. Melby's testimony did not indicate a lack of veracity, but instead indicated timidity with respect to (i) testifying to events she did not specifically remember and (ii) analyzing her seal and signature on the documents that she did not specifically remember. *See* Tr. 105:19-20; 106-107. While Ms. Melby could not swear that the Debtor was actually in front of her at the time of signing, she also testified that she has not notarized documents without the signing party present. The Court cannot say that Ms. Melby's testimony, alone or combined with the other evidence in the case, leaves the Court with the firm belief or conviction that the Debtor did not appear before her.

presumption afforded to notaries would seem to foreclose review of (absent the Debtor rebutting such presumption). Even if the Debtor had rebutted the presumption, the Court finds that the handwriting evidence does not establish fraud or forgery by clear and convincing evidence. As noted above, Mr. Hargett issued the following opinions, among others, with respect to whether Mr. David signed the claims at issue.

1. The Allonges, bearing pen and ink signatures, *appeared* to have not been signed by Mr. David. Tr. 75:12-76:3. The Allonges are identified as Exhibits 20, 53, 85, 113 and 142. (emphasis added)

4. The remaining 27 signatures that were examined did not *appear* to be penned by Mr. David. Tr. 76:11-14. (emphasis added)

To reiterate, Mr. Hargett's foregoing opinions were expressed at either the "probably not" or "evidence suggests it could not be the writer" levels of confidence. The Court finds that neither of these standards satisfy the clear and convincing standard required to show fraud. First, Mr. Hargett's testimony as to what "appears" meant with respect to his confidence scale was unclear. He testified that "appears" could mean either probable (which is a 3 on the positive end of the confidence scale, or a 7 on the negative scale) or that there is evidence to suggest it could or could not be the writer (a 4 on the positive scale and a 6 on the negative scale). Tr. 93:5-12. As a result, it is unclear at which confidence level the above opinions were expressed. Even if the level was that of "probably," (i.e., higher than the "evidence to suggest" standard) which would seem to align with this Court's preponderance of the evidence standard (more probable than not), the Court finds that the "probably" confidence level would still fall short of the clear and convincing standard for fraud.

Mr. Morris' testimony and report do not change this result. Indeed, with respect to the claims at issue, Mr. Morris was not able to determine whether the Allonges, bearing pen and ink signatures, were signed by Mr. David. Tr. 225:1-20. This is not clear and convincing evidence of fraud or nonappearance that leaves a firm conviction in the mind of this Court—it is an inconclusive statement.

**Conclusion**

Accordingly, the Court finds that the Debtor has failed to prove nonappearance or fraud by clear and convincing evidence as is required to rebut (i) the presumption that the notaries in this case properly performed their duties and (ii) the presumption of validity afforded to notarized documents. Because Debtor has failed to rebut the notary presumption and has not otherwise proven forgery by clear or convincing evidence, he has also failed to shift the burden of proof to Summit for purposes of the Debtor's objections to Claims 3-3, 5-3, 6-3 and 7-3. As a result, the Court will overrule the Debtor's objections to those claims and those claims will be allowed as filed.

A separate Order will issue.

Date: Sep 30 2022

/s/ Klinette H Kindred
Klinette H. Kindred
United States Bankruptcy Judge

Entered On Docket: September 30, 2022

Mailed copies to:

Byron F David
716 Treys Drive,
Winchester, VA 22601
Debtor

Electronic copies to:

Thomas P. Gorman
*Chapter 13 Trustee*

James P. Campbell
*Debtor's Counsel*

Quinton B. Callahan, Esq.
*Counsel to Summit Community Bank*